NOTICE:  NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

JEREMY CARDWELL, *Appellant*.

No. 1 CA-CR 14-0397
FILED 4-7-2016

Appeal from the Superior Court in Maricopa County
No.  CR2013-101774-001 SE
The Honorable Joseph C. Kreamer, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Ballecer & Segal, L.L.P., Phoenix
By Natalee E. Segal
*Counsel for Appellant*

## MEMORANDUM DECISION

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Peter B. Swann and Judge Donn Kessler joined.

**W I N T H R O P**, Judge:

¶1        Jeremy Cardwell ("Appellant") appeals his convictions and sentences for first degree murder and burglary in the second degree. He argues the trial court erred in three evidentiary rulings, in denying his request for a third-party culpability jury instruction, and in considering pecuniary gain as an aggravating factor for sentencing purposes. Finding no error, we affirm.

## FACTS AND PROCEDURAL BACKGROUND[1]

¶2        After the victim and her husband, Michael Mors, divorced in 2009, the victim continued to reside in the couple's home ("the Home"). The divorce had been contentious, and although the family court had ordered the victim to sell the Home and pay Mors his share of any potential sale proceeds, a downturn in the local housing market prevented the victim from doing so immediately. The victim obtained an order of protection against Mors, prohibiting him from contacting her or coming to the Home.

¶3        Mors and Appellant were close friends and roommates. In January 2012, they moved into a bedroom in a home owned by a couple they had recently met, after explaining to the couple that "they needed somewhere to stay until their house became available." They each paid $200 per month in rent.

¶4        Between 5:55 p.m. and 6:18 p.m. on February 25, 2012, the victim's boyfriend went to the Home, where he discovered the victim's "cold" lifeless body. She had been strangled sometime after approximately 11:00 a.m., and pennies covered her eyes. The subsequent police investigation revealed that, although the victim's credit and debit cards and

---

[1]        We view the facts in the light most favorable to sustaining the verdicts and resolve all reasonable inferences against Appellant. *See State v. Kiper*, 181 Ariz. 62, 64, 887 P.2d 592, 594 (App. 1994).

a meat slicer were apparently missing, the Home had been "staged" to appear as if it had been burglarized.[2] Mors' fingerprints were discovered on a mirror on a closet door in the Home.

¶5          In March 2012, Mors "got the keys to the house," and Appellant moved into the Home the same day. Sometime thereafter, Appellant was placed in jail on unrelated charges. In May 2012, Mors sold the Home. Mors received $172,196.14 from the proceeds, and he moved to another state in June 2012.

¶6          Initially, Mors was a suspect in the victim's murder, but his DNA did not match the DNA collected from underneath the victim's fingernails. Appellant's DNA, however, was found to be a contributor to the DNA mixture under the victim's left fingernails.

¶7          Based on information gleaned from cell phone towers in the area, police determined Appellant's cell phone and, presumably, Appellant, were near the Home at approximately the time the victim was killed, but Mors' phone was not. Police also obtained a postcard ("the Postcard") written by Appellant while he was in jail after the victim's murder.[3] The Postcard was addressed to Mors at the Home's address and delivered to the Home in July 2012 when its new owners—who purchased the Home from Mors—resided there. The message on the Postcard indicates Appellant believed he had satisfied his obligations pursuant to a "deal" between him and Mors, and Appellant wanted "to know where we stand."

¶8          A grand jury issued an indictment, charging Appellant with Count I, first degree murder, a class one felony, and Count II, burglary in the second degree, a class three felony.[4] The State later alleged multiple aggravating factors, including that Appellant committed the charged

---

[2]     No one attempted to use the missing credit and debit cards after the victim's death. The day after the victim was killed, however, Appellant gave a meat slicer to the couple with whom he and Mors had been living. Appellant claimed he had obtained the meat slicer at a garage sale.

[3]     Before the Postcard was admitted into evidence, the State redacted from it all information indicating Appellant's incarceration.

[4]     The murder charge was predicated on alternative theories of premeditation and felony murder. *See* Ariz. Rev. Stat. ("A.R.S.") § 13-1105(A)(1)-(2) (2010).

offenses for pecuniary gain. At trial, and over Appellant's objections, the trial court admitted into evidence photographs of the victim's corpse and the "ransacked" Home, the Postcard, and expert testimony regarding the relative locations of Appellant's and Mors' cell phones around the time of the murder. Before the court instructed the jury, Appellant proposed a specific third-party culpability instruction, arguing the trial evidence—specifically Mors' fingerprints in the Home—reasonably supported giving the instruction. The trial court denied Appellant's request but permitted him to argue the evidence tended to create reasonable doubt as to his guilt.

¶9 The jury found Appellant guilty as charged, and the court imposed a natural life sentence for the murder conviction and a concurrent, aggravated fifteen-year prison term for the burglary conviction. Appellant timely appealed, and we have jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9, and A.R.S. §§ 12–120.21(A)(1) (2003), 13–4031 (2010), and 13–4033(A) (2010).

**ANALYSIS**

*I.    Evidentiary Rulings*

¶10 Generally, relevant evidence is admissible unless proscribed by law or an evidentiary rule. Ariz. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Ariz. R. Evid. 401. The court may, however, exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice or needlessly presenting cumulative evidence. Ariz. R. Evid. 403.

¶11 We review the trial court's evidentiary rulings for an abuse of discretion. *State v. Davolt*, 207 Ariz. 191, 208, ¶ 60, 84 P.3d 456, 473 (2004) (reviewing the admission of photographs and videotape); *State v. Chavez*, 225 Ariz. 442, 443, ¶ 5, 239 P.3d 761, 762 (App. 2010) (reviewing the admission of text messages over a hearsay objection); *State v. Salazar*, 182 Ariz. 604, 610, 898 P.2d 982, 988 (App. 1995) (reviewing the preclusion of expert witness testimony); *see also State v. Cañez*, 202 Ariz. 133, 153, ¶ 61, 42 P.3d 564, 584 (2002) ("Because the trial court is best situated to conduct the Rule 403 balance, we will reverse its ruling only for abuse of discretion." (citation omitted)), *supplemented by* 205 Ariz. 620, 74 P.3d 932 (2003), *and abrogation on other grounds recognized by McKinney v. Ryan*, 813 F.3d 798, 815-26 (9th Cir. 2015). An abuse of discretion occurs when "no reasonable judge would have reached the same result under the circumstances." *State v.*

*Armstrong*, 208 Ariz. 345, 354, ¶ 40, 93 P.3d 1061, 1070 (citation omitted), *supplemented by* 208 Ariz. 360, 93 P.3d 1076 (2004).

### A. Photographs

**¶12** Appellant challenges the admission of several photographs into evidence. Three photographs, collectively, show two handgun holsters and boxes of ammunition in open drawers, to the left of which are fourteen books and other unidentifiable objects strewn on the floor ("the Ransack Photos"). The remaining photographs relate to the medical examiner's autopsy: three pre-autopsy photos of the victim's unclothed body lying on an examination table ("the Pre-Autopsy Photos"), and autopsy photos depicting (1) the victim's reflected scalp exposing an acute right postauricular focal hemorrhage resulting from "some type of force or impact," and (2) her dissected neck showing bleeding into the entire right sternocleidomastoid muscle, which indicates the victim was recently strangled and/or smothered ("the Autopsy Photos").

**¶13** In assessing the admissibility of photographs, we utilize a three-part test, in which we examine (1) relevance, (2) the tendency to incite or inflame, and (3) the probative value versus the potential to cause unfair prejudice. *Davolt*, 207 Ariz. at 208, ¶ 60, 84 P.3d at 473. "Photographs are relevant when they aid the jury in understanding an issue in the case." *State v. Jones*, 203 Ariz. 1, 9, ¶ 28, 49 P.3d 273, 281 (2002) (citation omitted). Photographs may be relevant to corroborate testimony; to illustrate or explain testimony; to identify the victim; to show the nature, extent, and location of injuries; to help determine the degree of the crime; and to corroborate the State's theory of how and why the crime was committed. *State v. Anderson*, 210 Ariz. 327, 339-40, ¶ 39, 111 P.3d 369, 381-82 (2005). Relevant photographs may be admitted into evidence even if they may tend to prejudice the jury against the defendant. *State v. Bocharski*, 200 Ariz. 50, 55, ¶ 21, 22 P.3d 43, 48 (2001). Even gruesome or inflammatory photographs may be admitted, as long as they are not admitted for the sole purpose of inflaming the jury. *State v. Morris*, 215 Ariz. 324, 339, ¶ 70, 160 P.3d 203, 218 (2007).

**¶14** Appellant contends the Ransack Photos are irrelevant because the State had many other photographs that depict the Home's disarray, and the gun-related evidence is unfairly prejudicial because it "interjects an element of violence and dangerousness . . . without serving a probative purpose." We disagree.

¶15            The Ransack Photos were relevant to illustrate the State's theory of premeditation; namely, that Appellant, to deflect suspicion from Mors and himself, staged the scene to appear as if "a burglary that went bad" had occurred. And although photographs of other locations in the Home showing it had been "ransacked" were admitted, none of those other photos depicted the particular piece of furniture in the victim's bedroom, which is where her body was found. Further, the Ransack Photos are not inflammatory, and the depiction of items related to handguns was not prejudicial because the State made clear at trial that no guns were stolen or otherwise used in the commission of the charged offenses. The trial court did not abuse its discretion in admitting the Ransack Photos.

¶16            Appellant also challenges the relevancy of the Pre-Autopsy Photos, and contends they only served to evoke the jurors' sympathy. We conclude otherwise. The Pre-Autopsy Photos showed some of the victim's external injuries, including a defensive injury to her left hand. The photos were, therefore, admitted not to evoke sympathy, but to help illustrate the medical examiner's testimony regarding the victim's injuries, and to provide context to the examiner's testimony explaining how the body was prepared for the autopsy.

¶17            With respect to the Autopsy Photos, Appellant argues the photos' depictions of injuries that indicate the victim was asphyxiated are irrelevant because he did not challenge the victim's cause of death. However, the fact and cause of death in a homicide prosecution are always relevant, even if undisputed. *Cañez*, 202 Ariz. at 154, ¶ 66, 42 P.3d at 585. Thus, Appellant's trial strategy in not contesting the cause of death did not render the Autopsy Photos irrelevant. *See id.* (noting the State "must carry its burden of proof on uncontested issues as well as contested ones" and, therefore, rejecting an assertion that photos of the deceased were irrelevant because they were "probative only of matters not in dispute").

¶18            Finally, the Pre-Autopsy and Autopsy Photos are not so gruesome that their probative value is outweighed by the danger of unfair prejudice under Rule 403. *See, e.g., State v. Castaneda*, 150 Ariz. 382, 391, 724 P.2d 1, 10 (1986) (holding that photographs of stab wounds in the victim's chest and the victim's nude body smeared with blood were properly admitted); *State v. Poland*, 144 Ariz. 388, 401, 698 P.2d 183, 196 (1985) (holding that a photograph of a victim's fully clothed body lying face down was not gruesome, and a close-up photograph of a victim's torso and decomposed head, although gruesome, was properly admitted because the

probative value outweighed the prejudicial effect). The court did not abuse its discretion in admitting the Pre-Autopsy and Autopsy Photos.[5]

### B. Postcard

**¶19** As redacted, the Postcard bears the following message:

> Hey man[,] what's going on? I got the message from a friend you just got done re-modeling. I wish you would write. I need to know where we stand. Again, I would like to hear from you on where we stand. I've kepted [sic] my deal. Please just give me the courtesy of a letter. I know you've been busy[.] PLEASE!!!

**¶20** Appellant contends the Postcard should have been precluded because its probative value is substantially outweighed by the danger of unfair prejudice.[6] *See* Ariz. R. Evid. 403. He argues the Postcard's reference to a deal is "speculative" and "not probative of a particular fact," and that "[t]here was no context given for the 'deal.'" Appellant also asserts the Postcard's probative value is diminished because other trial evidence establishes a connection between him and Mors. We reject these arguments.

**¶21** The Postcard's reference to a "deal" was not so speculative that it lacked probative value. Given the circumstances around the time of the murder—namely that (1) Mors had little or no income, (2) Mors was expecting a share of the sale proceeds once the victim sold the Home, (3) the victim had not yet listed the Home for sale, (4) Mors was not permitted to be in the Home due to the order of protection, (5) Mors and his friend, Appellant, wanted to (and Appellant did) move into the Home apparently to discontinue paying rent, and (6) Mors received a large sum of money after he sold the Home—one could reasonably infer that the "deal" referred to an agreement between Appellant and Mors, whereby Appellant would murder the victim in exchange for a share of the expected proceeds when

---

[5] It appears from the record that two other complained-of photographs were not admitted into evidence. In any event, we find no abuse of the court's discretion.

[6] In concluding the partially redacted Postcard was admissible, the trial court rejected Appellant's hearsay objection and concluded the Postcard constituted a non-hearsay statement by a party opponent. *See* Ariz. R. Evid. 801(d)(2)(A).

Mors sold the Home. Indeed, a detective who investigated this case testified on cross-examination that, in his opinion, the Postcard's reference to a "deal," in conjunction with other evidence, could *only* mean Appellant and Mors had such an agreement.

**¶22** Construed in such a manner, the Postcard is the only evidence of Appellant's admission to the crimes in his own words. Accordingly, the Postcard was highly relevant not only to prove Appellant's premeditation to commit murder, but also to rebut his third-party defense. Furthermore, Appellant cannot establish the unfairly prejudicial nature of the Postcard. *See State v. Mott*, 187 Ariz. 536, 545, 931 P.2d 1046, 1055 (1997) ("Unfair prejudice results if the evidence has an undue tendency to suggest decision on an improper basis, such as emotion, sympathy, or horror." (citation omitted)). As noted, the State redacted all information on the Postcard showing Appellant was incarcerated when he mailed it. The court did not abuse its discretion in admitting the Postcard.

### C. Expert Testimony

**¶23** After his indictment in this case, Appellant indicated his intent to present a defense based solely on the insufficiency of the State's evidence. After voir dire commenced, however, he gave notice that he intended to assert a third-party culpability defense based on evidence expected to be presented at trial indicating Mors could have been physically present in the Home at the time the victim was killed, and therefore could have killed the victim instead of Appellant. Noting the untimeliness of Appellant's notice and request to admit third-party culpability evidence, the court decided "to give the state a lot of latitude to tell [the court] what it needs to do to be ready, because [the third-party culpability defense] is unexpected to the state." Almost immediately, the State informed Appellant and the court that it would need "to call [cell] tower experts" to rebut the proffered defense and establish that Appellant, and not Mors, was near the victim's home around the time of the murder. Ten days later, the State disclosed Steve Kartz, an employee of Sprint, the mobile carrier used by Appellant, and Anthony Badalamenti, an employee of AT&T, the mobile carrier used by Mors. Appellant moved to preclude Kartz and Badalamenti from testifying, arguing in part their testimony was cumulative to the State's expected expert testimony of Westry Wilton. *See* Ariz. R. Evid. 403. The court denied the motion.

**¶24** Appellant contends the court erred in denying his motion to preclude the testimony of Kartz and Badalamenti. He argues the testimony provided by them was cumulative, unnecessary, and a waste of time.

¶25        Wilton testified as a criminal intelligence analyst employed by the Rocky Mountain Information Network, an organization that analyzes cellphone records provided by law enforcement agencies and prepares for those agencies reports and cellphone maps showing the locations, over a given period of time, of the cellphones related to the records. The maps Wilton created in this case illustrate the relative locations of the cellphones used by Appellant, Mors, the victim, and the victim's boyfriend on February 25, 2012, and, with respect to Appellant and Mors, the six preceding days as well. Wilton determined the locations based on the phone records' indications of the times the phones would "ping" off particular cellphone towers. On cross-examination, Wilton admitted she is not an expert in the field of cellphone tower operations.

¶26        Kartz and Badalamenti are radio frequency engineers who testified about various technical aspects of their respective employer cellphone carriers' "towers." In doing so, they also corroborated Wilton's testimony regarding the locations of Mors' and Appellant's cellphones around the time of the victim's murder. As Appellant concedes, Kartz and Badalamenti testified in more detail than did Wilton regarding "the way the cell towers work specific to each carrier."

¶27        Because Kartz and Badalamenti testified as experts regarding a field of cellphone tower technology in which Wilton was not an expert, their expert testimony was necessary to rebut Appellant's attempt to impeach Wilton on the basis of her lack of expertise. Accordingly, Kartz's and Badalamenti's testimony was not unnecessarily cumulative, and the court did not abuse its discretion in denying Appellant's motion to preclude.[7] *See State v. Verive*, 128 Ariz. 570, 576, 627 P.2d 721, 727 (App. 1981) ("To reject relevant evidence on the basis of unfair prejudice and cumulativeness is within the discretion of the trial court.").

II.        *Third-Party Culpability Instruction*

¶28        Appellant next argues the trial court erred by refusing his request to instruct the jury on third-party culpability. Appellant contends the court was required to do so because the evidence supported his theory

---

[7]        Further, Appellant did not raise an objection based on the alleged cumulative nature of the testimony when Kartz and Badalamenti testified, despite the fact that the trial court expressly allowed him to do so, stating it would consider such an objection "if and when it happens."

of third-party culpability. He cites no authority supporting his assertion that a jury must be instructed on such a defense theory.

¶29 We will not reverse a trial court's decision to refuse a jury instruction absent a clear abuse of discretion. *State v. Cox*, 214 Ariz. 518, 521, ¶ 16, 155 P.3d 357, 360 (App. 2007). Although a defendant is entitled to a jury instruction on any theory reasonably supported by the evidence, a trial court acts within its discretion when it refuses an instruction that lacks a factual or legal basis. *See State v. Vandever*, 211 Ariz. 206, 208, ¶ 7, 119 P.3d 473, 475 (App. 2005) (citations omitted); *see also State v. Johnson*, 205 Ariz. 413, 417, ¶ 10, 72 P.3d 343, 347 (App. 2003) (recognizing that a conviction may be reversed if jury instructions may have misled the jury or are otherwise deficient (citations omitted)). Moreover, "[w]here the law is adequately covered by [the] instructions as a whole, no reversible error has occurred." *State v. Doerr*, 193 Ariz. 56, 65, ¶ 35, 969 P.2d 1168, 1177 (1998) (citation omitted). "We will reverse only if the instructions, taken together, would have misled the jurors." *Id.* (citation omitted). When assessing the adequacy of jury instructions, closing arguments may also be considered. *State v. Bruggeman*, 161 Ariz. 508, 510, 779 P.2d 823, 825 (App. 1989).

¶30 Appellant requested the following instruction:

Jeremy Cardwell maintains that he did not kill [the victim], but that Michael Mors did instead.

In order for you to consider a third party culpability defense, Defendant must show some evidence concerning a third person or third persons that *tends* to create reasonable doubt as to his guilt. Defendant does not need to prove beyond a reasonable doubt that the third party is guilty of the charged offense. The evidence need only *tend* to show that a third person or persons committed the offenses and thus *tend* to create a reasonable doubt as to Defendant's guilt.

SOURCES: *State v. Prion*, 203 Ariz. 157, 161, 52 P.3d 189[, 193] (2002); *State v. Gibson*, 202 Ariz. 321, 323, 44 P.3d 1001[, 1003] (2002); [*People*] *v. Henderson*, 110 Cal. App. 4th 737, 741-43 (Cal. Ct. App. 2003); *State v. Arroyo*, 935 A.2d 975, 982-87 ([Conn.] 2007).

¶31 We agree with Appellant that the trial evidence could be construed as supporting a defense theory that Mors murdered the victim. We disagree with his assertion, however, that Arizona law requires the third-party culpability instruction he presented to the court. Moreover, the

other instructions provided by the court, in addition to the parties' closing arguments, adequately covered the substance of third-party culpability.

¶32        First, the Arizona cases Appellant relied on for his proposed instruction, *Prion* and *Gibson*, deal with the admissibility of third-party culpability *evidence*, not third-party culpability jury instructions. *State v. Parker*, 231 Ariz. 391, 405, ¶ 55, 296 P.3d 54, 68 (2013) (citing *Prion*, 203 Ariz. at 161-62, ¶¶ 19-27, 52 P.3d at 193-94; *Gibson*, 202 Ariz. at 323-24, ¶¶ 11-19, 44 P.3d at 1003-04). And, as our supreme court has expressly recognized, "[n]o Arizona case has required a third-party culpability instruction." *Id.*

¶33        Second, the trial court's instructions to the jury regarding the presumption of innocence and the State's burden to prove guilt beyond a reasonable doubt adequately reflected the substance of the proposed instruction. *See id.* at ¶ 56. Furthermore, defense counsel's closing argument made clear to the jurors that they could not find Appellant guilty if they determined Mors killed the victim. The court did not abuse its discretion in refusing to give the third-party culpability instruction.

### III.    *Pecuniary Gain*

¶34        At sentencing, the court found the following factors supported a natural life sentence for the murder conviction and an aggravated sentence for the burglary conviction: Appellant's five prior felony convictions, harm to the victim and her family, and pecuniary gain.[8] Of those factors, the court found harm to the victim and her family to be "the most weighty and crushing . . . a huge aggravating factor." As for pecuniary gain, the court stated as follows:

> We are not talking about pecuniary gain. I agree that there's not really clear evidence there. We can look at the postcard. We can look at circumstances. I do consider pecuniary gain but I don't give it [a] whole lot of weight because of the concern I have got regarding the lack of

---

8        Regarding its choice between a parole-eligible and a natural life sentence for the murder conviction, the court found "the fact that [Appellant] went back and lived in [the Home] for two to three weeks to me tips the balance [to imposing natural life]." Although natural life is technically not an "aggravated" sentence that requires specific findings, *see State v. Fell*, 210 Ariz. 554, 558, ¶¶ 12-15, 115 P.3d 594, 598 (2005), a court is required to "consider" the aggravating and mitigating circumstances listed in A.R.S. § 13-701 (Supp. 2015). A.R.S. § 13-752(Q)(2) (Supp. 2015).

evidence as to what that pecuniary gain is. However, I think there is a pretty strong inference that there was or was expected to be pecuniary gain based on the evidence that was there.

The court found no mitigating factors.

¶35 Appellant argues the court erred in considering pecuniary gain as an aggravating factor in his sentencing. We find no error.

¶36 The preponderance of the trial evidence supports an inference that Appellant murdered the victim in anticipation of the receipt of something of pecuniary value. *See State v. Martinez*, 210 Ariz. 578, 585, ¶ 26, 115 P.3d 618, 625 (2005). Specifically, facts and inferences from the record support the conclusion that Appellant stole the victim's credit and debit cards, took the meat slicer from the Home, lived in the Home rent-free after the murder, and expected from Mors a share of the Home's sale proceeds. Accordingly, to whatever extent the court did consider pecuniary gain as an aggravating factor when sentencing Appellant, no error occurred.[9]

¶37 Furthermore, Appellant does not challenge the propriety of the remaining aggravating factors relied on by the court; thus, those factors alone, absent the pecuniary gain aggravator, subjected Appellant to aggravated sentences. *See id.* at 584, ¶ 21, 115 P.3d at 624 (noting that, once an aggravating factor is properly found, a defendant is exposed to the maximum statutory sentence). Accordingly, even if we were to conclude that pecuniary gain was improperly considered in the first instance, Appellant's sentence would remain the same based on the court's affording considerable weight to the other applicable aggravating factors. *See State v. Hardwick*, 183 Ariz. 649, 656-57, 905 P.2d 1384, 1391-92 (App. 1995) ("When a trial court relies on both proper and improper factors in aggravating a sentence, this court will uphold its decision only where the record clearly shows the trial court would have reached the same result even without consideration of the improper factors." (internal quotation marks and citation omitted)).

---

[9] Also, the court did not abuse its discretion in affording pecuniary gain the weight it did. *See State v. Harvey*, 193 Ariz. 472, 477, ¶ 25, 974 P.2d 451, 456 (App. 1998) (recognizing that weighing aggravating and mitigating factors is a matter for the trial court's sound discretion). Indeed, the court afforded the factor little significance.

**CONCLUSION**

¶38 Appellant's convictions and sentences are affirmed.



Ruth A. Willingham · Clerk of the Court
FILED: ama